**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: GADOLINIUM-BASED** ) | **Case No.  1:08 GD 50000** |
| **CONTRAST AGENTS PRODUCTS** ) | |
| **LIABILITY LITIGATION** ) | **MDL No. 1909** |
| ) | |
| ) | **Judge Dan Aaron Polster** |
| ———————————————— ) | |
| ) | **Case No. 1:12 GD 50004** |
| **Paul Decker et al.,** ) | |
| ) | **MEMORANDUM OF OPINION** |
| **- against -** ) | **AND ORDER** |
| ) | |
| **GE Healthcare, Inc., et al.,** ) | |
| ———————————————— ) | |

Pending before the Court is Defendant GE Healthcare's motion for a new trial, to alter or

amend the judgment, and for remittutur (**Doc. #: 271**).  For the reasons to follow, the motion is

**DENIED**.

## I.    Background

On September 2, 2005, Plaintiff Paul Decker was injected with a gadolinium-based

contrast dye developed and sold by GE Healthcare, Inc. ("GEHC").  Such dyes are used in

conjunction with magnetic-resonance-imaging procedures.  The dyes enhance the quality of the

images, but they can be extremely toxic to patients with impaired kidney functions.  Mr.

Decker's kidneys were impaired when he received the dose of GEHC's contrast dye, Omniscan,

and some time later he developed Nephrogenic Systemic Fibrosis ("NSF"), a debilitating disease

that hardens the skin and internal organs and stiffens the joints.  Mr. Decker and his wife, Karen,

thereafter sued GEHC under Ohio law.

On March 22, 2013, after twelve days of testimony and two days of deliberation, a jury returned a verdict in favor of Mr. and Mrs. Decker. The jury unanimously determined that GEHC knew or should have known about the risks of Omniscan to patients with renal impairment but failed to adequately warn the medical community—including Mr. Decker's radiologist, who administered the drug—about those risks.[1] The jury awarded Mr. Decker $4,500,000 in compensatory damages: $1,000,000 for economic loss; and $3,500,000 for noneconomic loss. The jury awarded Mrs. Decker $500,000 for loss of consortium.

The Court must now rule on GEHC's motion, which seeks a new trial, to alter or amend the judgment, and remittitur (i.e., to reduce the jury's award). (Doc. #: 271.) GEHC advances six arguments:

- Plaintiffs failed to prove the element of causation

- The Court's decision not to give a jury instruction about "Adverse Event Reports" unfairly prejudiced GEHC

- Admitting evidence that a Danish governmental agency had determined that Omniscan caused the injuries reported in a 2003 Adverse Event Report unfairly prejudiced GEHC

- The Court wrongly excluded from evidence Mr. Decker's past medical bills

- Plaintiff failed to provide evidence to support an award based on mental distress

- Because I recused myself from ruling on Plaintiffs' post-trial motion for prejudgment interest, I should never have presided over the trial

The Court has already ruled on—and rejected—GEHC's last argument, (see Doc. #: 272), so this opinion will focus on the other five.

---

[1]The jury found for GEHC on Plaintiffs' other two claims: design-defect and nonconformance to representation.

## II.    Standard of Review

A court "may grant a new trial under Rule 59 if the verdict is against the weight of the evidence, if the damages award is excessive, or if the trial was influenced by prejudice or bias, or [was] otherwise unfair to the moving party."  *Rush v. Ill. Cent. R.R.*, 399 F.3d 705, 727 (6th Cir. 2005).

At the same time, "[t]he importance of Rule 61 in its application to motions for a new trial cannot be overlooked."  11 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2805 (3d ed. 2012).  Rule 61 is the harmless error rule: "Unless justice requires otherwise, no error . . . is ground for granting a new trial . . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights."  FED. R. CIV. P. 61.

## III.    Causation

To support their failure-to-warn claim, Plaintiffs presented to the jury the scientific evidence GEHC was aware of in September 2005—when Mr. Decker received a dose of Omniscan—that indicated the drug was toxic to renally impaired patients.  This information included chemistry, toxicology, and human studies, some of which were conducted internally by GEHC employees and consultants but left unpublished and undisclosed to regulatory authorities.  The information also included four Adverse Event Reports.  An Adverse Event Report is a report sent to a drug company.  The report tells the company that a patient experienced a harmful event after taking its drug.

Plaintiffs also offered the testimony of Cheryl Blume, Ph.D., an expert in the field of pharmacovigilance.  She analyzed the label that was on the Omniscan packaging in 2005.  She pointed out the ways in which the label failed to capture what GEHC knew about the risk of

gadolinium toxicity. The label did not "reflect the data [GEHC] generated in multiple studies with patients with impaired renal function"; these studies showed that renally impaired patients retained abnormally high levels of gadolinium in their system for weeks after receiving a dose of the drug. (Doc. #: 197 at 194, Trial Tr. Mar. 12, 2013, at 1578.) The label did not tell doctors that the retained gadolinium might be in an "unchelated" state, meaning that it was no longer bound to the chemical that helped ensure its safe passage through the body and out via the kidneys. (Id. at 195, 1579.) The label did not inform doctors of the "laboratory experiments, preclinical experiments, and pharmacokinetics studies in renally-impaired patients. . . that suggest[ ] that there can be. . . an exaggerated period of time that the product stays in the body [during which] it can have serious consequences to various organ systems." (Id. at 198, 1582.) Moreover, according to Dr. Blume, the label should have mentioned the four Adverse Event Reports and the debilitating symptoms the patients in those reports suffered. (Id. at 196, 1580.)

To be sure, the 2005 label did contain a precaution for patients with renal disease. But that was the same precaution found on the labels of all classes of contrast dyes, including iodine-based contrast agents. As Dr. Blume told the jury, that precaution informs doctors of acute, short-term effects of contrast dyes; it does not reflect the debilitating, long-term harmful effects of gadolinium. (Id. at 197, 1581.)

Finally, and perhaps most significantly, Dr. Blume testified that GEHC should have put a contraindication on the label for patients with severe renal failure, telling doctors not to administer the drug to such patients. (Id. at 195, 1579.)

GEHC vigorously cross-examined Dr. Blume. GEHC also offered its own pharmacovigilance expert, Dr. David Feigal. It was ultimately up to the jury to decide whose testimony to credit.

-4-

Still, GEHC argues that Plaintiffs failed to prove the element of causation.  It argues that even if it had improved its warnings, Mr. Decker's doctor would have gone ahead and administered Omniscan anyway.  The argument is, in other words, that the allegedly inadequate warning was not a but-for cause of Mr. Decker's NSF.

GEHC bases its argument on the testimony of Dr. Geoffrey Wiot.  Dr. Wiot was a partner in the radiology practice where Mr. Decker received Omniscan.  Dr. Wiot was the one who decided which gadolinium-based dyes the clinic would use and what procedures the doctors in the clinic should follow in administering those dyes.  Dr. Wiot testified that only one piece of information would have changed his mind about Omniscan and impelled him to stop administering the dye to renally impaired patients: Knowing there was a relationship between Omniscan and NSF.  Since Plaintiffs' proposed warnings did not mention a link between Omniscan and NSF, the argument goes, the proposed warnings would not have changed Dr. Wiot's policy and, thus, would not have changed Mr. Decker's outcome.

But this argument misses the mark.  Although Dr. Wiot set the general procedures for his clinic, he was not the radiologist who treated Mr. Decker on September 2, 2005.  That was Dr. Phillip Shaffer.  It was Dr. Shaffer who was in charge of Mr. Decker's magnetic-resonance procedure.  It was he—not Dr. Wiot—who had to exercise independent, professional medical judgment on behalf of Mr. Decker, including deciding which contrast dye to administer (if any at all).  He had to decide, as he does with every patient, "whether the risk to the patient is worth the benefit," and if not, whether there were satisfactory alternatives.  (Doc. #: 196 at 13-17, Trial Tr. Mar. 11, 2013, at 1099-1103.)  It was Dr. Shaffer—not Dr. Wiot—who was ultimately responsible for Mr. Decker's treatment.  So, although Dr. Wiot's testimony was informative, it was not dispositive.

-5-

In contrast to Dr. Wiot, Dr. Shaffer testified that he would not have administered Omniscan to Mr. Decker if he knew what GEHC knew—specifically, that renally impaired patients retain an abnormally high level of gadolinium in their bodies after receiving a dose of Omniscan and that the high retention rate increases the risk of serious harm.  (Doc. #: 196 at 17-23, Trial Tr. Mar. 11, 2013, at 1103-1109.)  That is exactly what Dr. Blume testified GEHC's label *should have* indicated: Long-term retention of gadolinium, which can occur in renally impaired patients, can have "serious consequences to various organ systems."  (Doc. #: 197 at 198, Trial Tr. Mar. 12, 2013, at 1582.)  Moreover, it is hard to imagine that any competent doctor would have injected a renally impaired patient with Omniscan if the drug's label had included—as Dr. Blume said it should have—a contraindication for renally impaired patients.

Again, it was the jury's prerogative to determine which experts to credit and how to resolve conflicting testimony.  Suffice it to say that Plaintiffs produced sufficient evidence to support the jury's verdict.

### IV.    Limiting Instruction on "Adverse Events Reports"

Next, GEHC contends that the Court erred when it declined to give GEHC's requested limiting instruction on Adverse Event Reports ("AERs").  The requested instruction read as follows:

> You have also heard testimony and seen exhibits relating to adverse event reports (also known as "AERs"), including case reports, case series, spontaneous reports, and adverse events reporting injuries in persons who have been administered Omniscan.  AERs only provide notice to a manufacturer that a negative reaction occurred around the time that a drug was administered; they do not prove that the reaction was actually a side effect or caused by the drug administration.

(Doc. #: 271-1 at 40.)  GEHC is concerned that without this limiting instruction the jury likely

considered the AERs for an improper purpose: As proof of causation.  (Id. at 38.)[2]

Under Federal Rule of Evidence 105, if evidence is admissible for one purpose but not

for another the court, upon timely request, must restrict the evidence to its proper scope and

instruct the jury accordingly.  The first sentence of the 1972 Advisory Committee Notes to Rule

105 states, "A close relationship exists between this rule and Rule 403 which requires exclusion

when 'probative value is substantially outweighed by the danger of unfair prejudice, confusion

of the issues, or misleading the jury.'"  The goal of both Rule 105 and Rule 403 is to minimize

the risk that evidence will improperly prejudice, confuse, or mislead the jury.  But those rules are

applicable *only when there is such a risk*.  A limiting instruction that tells the jury, "Consider this

evidence for purpose X, but not for purpose Y," should not be given where there is minimal risk

that the jury would consider the evidence for purpose Y.  The instruction would draw

unnecessary attention to a purpose the jury would be unlikely to think about, and would likely

sow, rather than dispel, confusion.

Plaintiffs presented no evidence, and did not argue, that the four AERs proved that

Omniscan causes NSF generally or that it caused Mr. Decker's NSF specifically.  In addition,

GEHC presented no evidence challenging the fact that Mr. Decker had NSF, or the fact that his

NSF was caused by the single dose of Omniscan administered to him in 2005.  So a limiting

instruction would not have been helpful; indeed, it would have been confusing.  *United States v.*

---

[2]Contrary to GEHC's assertion, courts have held that AERs may be used to prove
causation.  *See, e.g.*, *Caraker v. Sandoz Pharm. Corp.*, 172 F. Supp. 2d 1046, 1050 (S.D. Ill. 2001)
(AERs may provide a valid foundation for a causation opinion if there is a temporal proximity
between a specific drug and a specific adverse reaction.); *Schedin v. Ortho-McNeil-Janssen
Pharm., Inc.*, 808 F. Supp. 2d 1125, 1139 (D. Minn. 2011) (AERs are commonly used by experts
to determine causation in conjunction with other evidence.), *rev'd in part on other grounds*, *In re
Levaquin Prods. Liab. Litig.*, 700 F.3d 1161 (8th Cir. 2012).  But the Court is assuming, for the sake
of the argument, that causation is not a proper purpose for which AERs may be admitted in
evidence.

*Woodman*,  No. 98-4527, 2000 WL 1234328 at *6 (6th Cir. Aug. 21, 2000) (noting that a jury

instruction should not be given if it lacks evidentiary support) (citation omitted).

Still, GEHC argues that the jury could not possibly understand AERs unless they were

put in their proper context and unless the limits of AERs were explained.  (Doc. # 271-1 at 37.)

Yet Hugo Flaten, GEHC's Director of Global Pharmacovigilance, did just that.  (See generally

Doc. #: 195 at 4-72, Trial Tr. Mar. 8, 2013, at 794-862.)  Dr. Flaten testified that, since pre-

approval clinical studies generally involve only a limited number of people, it is not until a drug

has been "launched" that large populations are exposed to the drug and its safety can be

adequately determined.  (Id. at 26, 816.)  That is why post-marketing surveillance of drugs by

manufacturers is "critical."  (Id. at 31, 821.)  Dr. Flaten testified that the key to

pharmacovigilance is the identification and evaluation of "safety signals"; these signals may

arise from a combination of preclinical studies (the manufacturer's own toxicology, chemistry,

thermodynamic, and animal studies) and post-marketing data (AERs and relevant studies

conducted by the manufacturer and others and reported in scientific and medical journals).  (Id.

at 32-33, 822-23.)  He testified that "even one, two or three [AERs] may represent a safety

signal."  (Id. at 33, 823.)  Once a safety signal has been identified, the drug manufacturer must

take affirmative steps to investigate.  (Id. at 25, 815 (noting that the investigation of safety

signals is not a passive act).)

In fact, both parties devoted a significant amount of trial time to the question of whether

the four AERs, received by GEHC between 2002 and the date of Mr. Decker's scan in 2005,

constituted safety signals which, along with all the other evidence, triggered an obligation by

GEHC to augment the warnings on the Omniscan label.  GEHC's fact and expert witnesses

testified at length as to why the AERs did not constitute safety signals alerting GEHC to the risk

to renally impaired persons, while Plaintiffs' experts testified at length as to why they did.

It is entirely proper to use AERs to show that a drug manufacturer had notice of adverse events of the type suffered by plaintiffs in failure-to-warn claims.  *See, e.g., In re Fosamax Prods. Liab. Litig.*, No. 06 MD 1789(JFK), 2013 WL 174416, at *4 (S.D.N.Y. Jan. 15, 2013) (AERs received by a drug manufacturer up to the time of a plaintiff's injury may be used to show that the manufacturer was on notice of potentially serious injuries); *Wolfe v. McNeil-PPC, Inc.*, No. 07-348, 2012 WL 38694, at *2 (E.D. Pa. Jan. 9, 2012) (same); *Schedin v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F. Supp. 2d 1125, 1139 (D. Minn. 2011); *Hogan v. Novartis Pharm. Corp.*, No. 06-civ-0260, 2011 WL 1533467, at *13 (E.D.N.Y. Apr. 24, 2011)*; In re Fosamax Prods. Liab. Litig.*, No. 1:06-MD-1789-JFK, 2010 WL 4242708, at *3 (S.D.N.Y. Oct. 27, 2010) (same).  Thus, the use of the AERs by Plaintiffs' experts on the question of notice was not error, and GEHC can show no prejudice because it vigorously cross examined Plaintiffs' experts on this question and presented its own experts to challenge Plaintiffs' experts.  *Schedin*, 808 F. Supp. 2d at 1139.

Finally, GEHC argues that it was error for the Court not to give the limiting instruction because it had previously approved the same instruction in *Knase*, another case in this MDL that nearly went to trial.  But *Knase* never went to trial; it settled out of court.  The Court's pretrial inclination to give the instruction in *Knase* may very well have been changed by the evidence actually admitted at trial.  9C Charles Alan Wright & Arthur R. Miller, Federal Practice And Procedure § 2553 (3d ed. 2008) ("When a district judge suggests jury instructions in the course of a pretrial conference, those instructions do not become final until the jury submission phase is reached.").

For all these reasons, the Court denies the motion for a new trial based on the Court's

failure to give GEHC's requested limiting instruction.

## V.    Evidence of Foreign Government Authority Actions

GEHC argues that the Court erred by admitting letters sent by Denmark's Patient Insurance Association ("PIA"), a Danish governmental agency, to GEHC's pharmacovigilance team between 2003 and 2005.  The letters notified GEHC of the PIA's conclusion that Omniscan, which had been administered to a patient named Birthe Madsen, the subject of a 2003 AER, caused her injuries.  The letters also informed GEHC that the PIA had awarded her family damages for her death.  GEHC acknowledges that the letters were admissible to prove notice—that is, notice to GEHC prior to Mr. Decker's 2005 scan that the woman who was the subject of the 2003 AER was determined to have NSF.  Nonetheless, GEHC argues that the Court should have excluded the letters and testimony about them because they were unfairly prejudicial:

> The PIA operates a "no-fault" award system unlike any no-fault insurance program with which jurors may have familiarity in their experience.  Through the testimony, the Court permitted Plaintiffs to try the case of a Danish citizen within Mr. Decker's case, portray the PIA's decision to award compensation to Ms. Madsen's family for injuries resulting from an acute hypersensitivity or anaphylactic reaction to Omniscan as a finding of liability tantamount to that made by a judge or jury in the U.S. system of justice, inform the jury that the PIA paid compensation to Ms. Madsen's family, then invite the jury to do the same by comparing Ms. Madsen's reaction to Omniscan to that of Mr. Decker.

(Doc. #: 271-1, at 43-44.)  Plaintiffs argue GEHC waived this argument by failing to timely raise it.  *See Helminski v. Ayerst Lab.*, 766 F.2d 208, 211 (6th Cir.1985) ("A party may not assert as error the introduction of evidence unless a timely objection is made.") (citing FED. R. EVID. 103(a)(1)).  GEHC replies that it "properly raised and preserved this issue in *Knase*."  GEHC explains:

At Plaintiffs' request, and over GEHC's objection, the Court applied the motions

-10-

> and rulings from the MDL bellwethers (including *Knase*) to *Decker*.  In *Knase*, GEHC moved *in limine* to exclude references to insurance . . . . Plaintiffs themselves recognized that GEHC's motion *in limine* sought to exclude PIA evidence, arguing that the motion would exclude evidence relevant to Birthe Madsen and the second AER. . . .The Court denied GEHC's motion. . . .The Court then ordered, at Plaintiff's request and over GEHC's objection, that the Court's prior rulings applied in this case. . . Accordingly, GEHC did not need to raise these arguments again.

(Doc. #: 289 at 25 (citations to the record omitted).)  This is a glaring misrepresentation of the record.

> The motion in *Knase* that GEHC now cites states:

> GEHC respectfully moves this Court for an Order *in limine* to preclude Plaintiffs from presenting or mentioning evidence of GEHC's liability insurance and any indemnity agreements to which GEHC is a party.  Such evidence is not relevant, has no probative value, and would be unfairly prejudicial to GEHC.  Any references to or other evidence pertaining to GEHC's liability insurance and any indemnity agreements to which GEHC is a party should, therefore, be excluded at trial.

(Case No. 1:08 gd 50026 ("*Knase*"), Doc. #: 178 at 18-19.)  In response, Plaintiffs argued that the motion was overbroad because it covered the Danish Patient Insurance Agency's report on Birthe Madsen and the communications sent to GEHC regrading her claim.  (*Knase*, Doc. #: 208 at 3-4.)

> To allay Plaintiffs' fears, GEHC replied that its motion did *not* seek to exclude this information:

> Contrary to Plaintiffs' assertions in the Opposition, GEHC has never sought exclusion of "*all* insurance-related evidence." . . . . Plaintiffs' discussion of Birthe Madsen is, therefore, entirely irrelevant to the Court's consideration of this motion . . . . *Such evidence simply has no relation to the kind of liability insurance that GEHC seeks to preclude under Rule 411.*

(Id., Doc. #: 239 at 9-10 (emphasis added) (citations to the record omitted).)  We see, therefore, that GEHC did *not* object to the PIA evidence in *Knase*.

-11-

Nor did GEHC raise the objection during this case.  GEHC failed to raise the issue in a motion *in limine*; failed to bring the matter to the attention of the Special Master when she was making recommendations to the Court on outstanding objections to both testimony and exhibits; failed to mention this issue in its trial brief when it challenged the admissibility of AER #4; and failed to object before or during the testimony of GEHC's pharmacovigilance witnesses (Flaten, Lihaug, and Rode) on March 8, 2013, all of whom testified regarding the PIA evidence.  All of these were opportune moments to raise the issue.  It was not until March 11, 2013, three days after GEHC's pharmacovigilance witnesses testified about the PIA evidence that GEHC hinted at an objection.  And it did so only by reference to the *Knase* motion which, as we have seen, did not actually raise the issue.  (Doc. #: 196 at 293, Trial Tr. Mar. 11, 2013, at 1379.)  For these reasons, the Court finds that GEHC waived its objection to this alleged error.[3]

Even if GEHC could somehow show that it preserved the error by properly raising it, the argument would fail on the merits.  GEHC asserts that the jury repeatedly heard, through the testimony of its own witnesses and Plaintiffs' experts, that the PIA concluded that Omniscan was responsible for Ms. Madsen's injuries.  GEHC does not argue that this testimony was a misrepresentation of the evidence.  And GEHC acknowledges that this evidence was relevant and admissible on the subject of GEHC's notice.  Rather, GEHC contends that this evidence was improperly used to show that Omniscan caused Mr. Decker's NSF.  As the Court explained in the previous section, however, GEHC never disputed that Omniscan caused Mr. Decker's NSF.  And if GEHC thought this evidence might be used by the jury for an improper purpose, it should

---

[3]GEHC further contends that the Court "effectively foreclosed the opportunity for GEHC to object to deposition testimony concerning the PIA's award of damages when it limited each side in *Knase* to only five objections in total to deposition designations" before trial.  (Doc. #: 289 at 25.)  But, as noted above, GEHC had plenty of opportunities to raise the objection during trial.

-12-

have requested a limiting instruction—another missed opportunity.

### VI.    Mr. Decker's Past Medical Bills

At trial, Plaintiffs sought economic damages only for future medical costs associated with Mr. Decker's NSF.  They did not request any compensation for past medical treatment for his NSF.  To that end, they presented the testimony of several expert witnesses, including Cynthia Wilhelm, Ph.D., a life-care planner.  Dr. Wilhelm reviewed Mr. Decker's past medical records and bills and compiled a life-care plan.  (Doc. #: 198 at 44-111, Trial Tr. Mar. 13, 2013, at 1732-1799.)  The present-day value of the life-care plan depended on Mr. Decker's life expectancy.  Another of Plaintiffs' experts testified that Mr. Decker has a life expectancy of anywhere between four and six years.  (Id. at 200, 1888.)  If he were to live four years, the life-care plan would cost $1.38 million in today's dollars; if he were to live six years it would be over $2 million.  (Doc. #: 288-22 at 2.)  During closing argument, Plaintiffs' lawyer asked the jury to award between "a million and a half to almost four million dollars."  (Doc. #: 215 at 64, Trial Tr. Mar. 20, 2013, at 3016.)

One of GEHC's lawyers cross-examined Dr. Wilhelm about specific items in the plan in an effort to show that some of the projected expenses were unrelated to Mr. Decker's NSF.  (Doc. #: 198 at 111-129, Trial Tr. Mar. 13, 2013, at 1799-1817.)  Evidently, this cross-examination was effective, for the jury awarded Mr. Decker only $1 million for his projected economic loss, substantially less than what he sought.  Nevertheless, GEHC claims the Court erred in excluding evidence of Mr. Decker's past medical bills.

GEHC sought to admit the medical bills (totaling $20,000) to show that the cost of Plaintiffs' life-care plan was excessive.  GEHC explains in its brief that "the Court's exclusion of Mr. Decker's past medical bills prevented the jury from following the Court's instruction to

-13-

measure the actual costs of managing Mr. Decker's NSF in the past against the life care plan's estimates of future costs." (Doc. #: 271-1 at 57.) But this kind of apples-to-apples comparison would have been valid only if the past medical bills did in fact relate to Mr. Decker's NSF.

GEHC could have established that link during the cross-examination of Dr. Wilhelm or through the testimony of its own expert witnesses. But it did neither. Instead, GEHC waited until the eve of closing arguments, after both sides had rested, to seek to introduce the bills. (Doc. #: 214 at 267, Trial Tr. Mar. 19, 2013, at 2917.) And the only proof it offered that those bills were related to Mr. Decker's NSF was its own lawyer's say-so: "I would tell you I have personally gone through the bills from all the facilities and made a good faith effort. I'm not telling you that I have every single one, but I made a good faith effort on that." (Doc. #: 214 at 282, Trial Tr. Mar. 19, 2013, at 2932.) The proffered testimony of trial counsel, after both sides had rested, was clearly not the right way to admit this evidence.

And even if this were somehow a valid basis, admitting the medical bills unaccompanied by expert testimony would have risked confusing and misleading the jury. *See* FED. R. EVID. 403. Without an expert to interpret the medical bills, the jury would have been unable to tell whether (and to what extent) they related to Mr. Decker's NSF and whether (and to what extent) they undermined Dr. Wilhelm's life-care plan.

What's more, the Court gave GEHC an opportunity to admit the bills properly, notwithstanding that GEHC had already rested: "We have not had any testimony about bills. If you want to put a witness on . . . you can. But, to just throw in a bunch of bills and then someone talks about them in final argument, when you had no testimony, I don't think that is proper." (Doc. #: 214 at 282-283, Trial Tr. Mar. 19, 2013, at 2932-2933.) GEHC chose not to avail itself of this opportunity.

-14-

Accordingly, GEHC cannot argue that the Court erred by excluding this evidence because GEHC declined the Court's invitation to introduce the bills through a witness.

## VII.    Damages for Mental Distress

GEHC's final argument is that the jury's verdict should be reduced by the amount in the life-care plan that related to mental distress (anti-depressant medication, treatment by a psychiatrist, and counseling for Mr. Decker and his family) because Plaintiffs did not provide evidence of mental distress.

But there *was* evidence of mental distress.  Mr. Decker testified that NSF has "devastated my life" and has weakened his emotional and psychological state.  (Doc. #: 195 at 216, Trial Tr. Mar. 8, 2013, at 1006.)  In fact, since 2009, he has been taking anti-depressant medication. (Doc. #: 198 at 43, Trial Tr. Mar. 13, 2013, at 1731.)  *Youssef v. Jones*, 77 Ohio App. 3d 500, 505 (1991) ("Since pain and suffering are subjective feelings, the injured person's testimony is the only direct proof of such damages . . . .Therefore, lay testimony is sufficient by itself to prove past pain and suffering damages.").   In addition, the jury heard (and saw) the devastating effects of NSF on Mr. Decker's body.  His joints have stiffened, his skin has hardened, and he is confined to a wheelchair; in fact, he has not been able to walk or stand for a year.  The jury was permitted to make the common-sense inference that the havoc the disease has wreaked on his body has adversely affected his mental well-being.  *See Doyle v. Fairfield Mach. Co.*, 120 Ohio App. 3d 192, 222 (Ohio Ct. App. 1997) ("[J]urors may rely upon their own personal experiences in determining the severity of [a plaintiff's] emotional distress.") (citing *Paugh v. Hanks*, 6 Ohio St. 3d 72, 80 (1983)).

Furthermore, Dr. Derek Fine, a nephrologist with expertise in NSF, reviewed the life-care plan and opined that all of the elements, including the items GEHC now challenges, were

reasonable and necessary for someone suffering from NSF.  (Doc. #: 198 at 197-198, Trial Tr. Mar. 13, 2013, at 1885-1886.)

In any event, the amount in the life-care plan allocated for treatment for mental distress was quite small: Between $16,000 and $36,000 (depending on how long Mr. Decker would live) out of the several million dollars requested.  The jury awarded Mr. Decker only one million dollars for future economic loss, far below what he sought, so any error in admitting this evidence was harmless.

### VIII.    Conclusion

For the foregoing reasons, the Court **DENIES** GEHC's motion for a new trial, to alter or amend the judgment, and for remittutur (**Doc. #: 271**).

**IT IS SO ORDERED.**

*/s/Dan Aaron Polster 7/25/13*
**Dan Aaron Polster**
**United States District Judge**